Morell C. Milroy, Appellee, v. James Ralph Milroy et al., Appellants.

**EXECUTORS AND ADMINISTRATORS:** Fiduciary Relation—Purchase From Heir. An administrator may not purchase of an heir the property of the estate without fully informing the heir of all

known facts bearing on the value of the property. Failing to so do to the damage of the heir may justify the cancellation of the conveyance.

*Appeal from Delaware District Court.*—GEORGE W. DUNHAM, Judge.

FEBRUARY 16, 1921.

ACTION in equity to set aside a written contract and several deeds conveying real property in Iowa and South Dakota. Both parties appeal from adverse rulings of the court. The material facts are fully stated in the opinion.—*Affirmed on both appeals.*

*Trewin, Simmons & Trewin* and *J. J. Locher,* for appellants.

*Carr & Carr* and *Edwards, Longley, Ransier & Smith,* for appellee.

PER CURIAM.—I.   Morell C. Milroy, who is the son of Peter Milroy, deceased, and the grandson of Peter and Mary Milroy, both of whom, at the time of the commencement of this action, were deceased, attained his majority, January 28, 1913, and on February 3, 1913, executed an instrument in writing, assigning and transferring to defendants all his interest in the estate of his grandfather, and on the same day executed deeds conveying to the same parties all his undivided interest in the real estate therein, which consisted of a residence in South Hopkinton, an electric light plant, several tracts of land in Delaware County, Iowa, and in Faulk, Hutchinson, and Sully Counties, South Dakota. Mary Milroy, surviving widow of Peter Milroy, Sr., on May 27, 1913, also conveyed to the defendants her undivided interest in the same real estate.

Plaintiff brings this action to set aside the written contract and several deeds executed by him to defendants, upon the ground that he was induced to execute the same by fraud practiced upon him by the defendant James Ralph Milroy; and also for the cancellation upon similar grounds, of the deeds executed by his grandmother, Mary Milroy, to the same parties.   The

court decreed the cancellation of the several instruments signed by plaintiff, but declined to set aside the deeds executed by Mary Milroy. All parties appeal.

The testimony relating to the transaction between plaintiff and the defendants is, in substance, as follows: James Ralph Milroy was the administrator of the estate of his father, Peter Milroy, and was not discharged as such until after February 3, 1913. Plaintiff's father died in September, 1901. His mother remarried, but plaintiff appears to have lived with relatives, most of the time after his father's death. At the time he attained his majority, and for some years prior thereto, he resided in or near Parkston, South Dakota, and, part of the time at least, at the home of his aunt, the defendant Margaret Belknap. Shortly before January 28, 1913, James Ralph Milroy had the written contract or assignment and the several deeds signed by plaintiff at Hopkinton on February 3d, prepared, and took them with him to Parkston, South Dakota. A few days before plaintiff became of age, he went to see his uncle, for the purpose, evidently, of opening negotiations with him for the sale of his interest in his grandfather's estate. Milroy, however, declined to discuss the matter with him at that time. On January 28, 1913, the day plaintiff became of age, the defendant James Ralph Milroy offered him $1,000 for his interest in the estate of Peter Milroy, of which Ralph was, at the time, the administrator. The offer was declined, and plaintiff testified that Ralph requested him to say nothing about it. The day following, plaintiff left South Dakota for Hopkinton, Iowa, to which place he was followed by Ralph, the day after. Shortly after his arrival at Hopkinton, he met Frank Barnes, who was engaged in the automobile, garage, and real estate business at that place. Plaintiff wanted to buy an automobile, but was without means to do so. At the suggestion of Barnes, plaintiff went with him to Monticello, where he consulted and employed W. M. Welch, an attorney at that place, to look after his interest in the estate. He also solicited a loan of Welch, for the purpose of enabling him to purchase an automobile. About this time, the defendant James Ralph Milroy, who, as stated, had returned from South Dakota, learned through Barnes what plain-

tiff had done. He then suggested to Barnes that he might make a deal with plaintiff for his share of the estate, and arranged to pay Barnes a commission, to assist him to obtain the conveyances in question. Barnes thereupon informed plaintiff that his uncles would buy his interest in the estate, and advised him to discharge Welch, who had not yet begun the contemplated investigation, which he did at once by telephone. Barnes then went to the president of the Farmers State Bank, whose name was W. T. Johnson, and arranged to share the commission with him, if he would assist in the negotiations with plaintiff. On the forenoon of February 3d, the day on which the contract and deeds were executed, Barnes took plaintiff to the bank, where they met Johnson; and, after considerable conversation and figuring, the conclusion was reached that plaintiff's interest in the land was worth about $6,000. The defendants James Ralph and W. A. Milroy, who apparently were in waiting, were then brought into the bank, where, after some further negotiations, the contract and deeds were executed.

So far, the facts are not disputed. Plaintiff testified that he was not familiar with the market value of the real estate in Delaware County; that Barnes told him that it would take considerable time and expense to take the matter through court, which would be necessary unless they were able to settle; and that, if he would discharge his lawyer, he thought his uncle would give him a good deal. The necessity and duty of court proceedings appear, also, to have been emphasized by some of the parties at the bank. So far as the record shows, plaintiff had no conversation, after arriving at Hopkinton, with any of the defendants, until they came to the bank, following the negotiations above referred to. Plaintiff knew nothing of the arrangement between Barnes, Johnson, and the defendants, further than that Barnes told him that the boys were willing to settle if they could buy him off, and would give him a good deal, if he would let Welch go. Plaintiff further testified that most of the figuring at the bank was done by Johnson. Johnson, however, claimed that plaintiff fixed the values placed upon the land and the electric light plant at Hopkinton. According to the testimony of Barnes, all of the parties except himself took part in the figuring, for the purpose of estimating the value of

the estate and arriving at the share of plaintiff. Plaintiff testified that Johnson made the figures, and announced that his share in the estate was about $6,000. Plaintiff made no inquiry as to the rental that was being paid for the use of the electric light plant. Neither Johnson nor Barnes knew anything about the value of the Dakota property. Ralph estimated the total value of the estate at $54,000, and stated to plaintiff that the indebtedness was about $30,000, some of which, the evidence shows, was secured by mortgage upon a part of the Iowa land and the land in South Dakota. Evidence introduced upon the trial on behalf of appellant fixed the value of the real property at from $70,000 to $75,000, on February 3, 1913. The evidence on the question of value was, however, very conflicting. By the terms of the written contract, or assignment, plaintiff transferred all his interest in the personal property to the defendants. The consideration paid plaintiff for his interest in the real and personal property of the estate was two long-time notes for $1,900 each, $200 in cash, and a Jackson automobile, that had been used by Barnes for demonstrating purposes, at the agreed value of $1,200. On February 3d, James Ralph Milroy, as administrator, had on hand $3,425.80, which he later distributed in equal shares to himself, W. A. Milroy, and Mrs. Belknap. Plaintiff claims that the defendant did not disclose the existence of this money, and that he did not know about it until he returned from South Dakota, where he went immediately after the settlement, shortly prior to the commencement of this action. Defendants introduced the testimony of an expert accountant, for the purpose of showing that this money, although divided among the defendants, as above stated, did not properly belong to the estate. It was, however, so handled, treated, and distributed; and it is not claimed that Ralph would not have received his share from the administrator, if the transactions complained of had not been had. So far as the law applicable to the facts disclosed is concerned, it has too often been reviewed by this court to call for repetition at this time. Manifestly, it was the duty of the defendant, who was the administrator of the estate of Peter Milroy, before taking an assignment of the interest of plaintiff therein, to fully and fairly disclose the facts to him. *Booth v. Bradford,* 114 Iowa 562; *Cur-*

*tis v. Armagast,* 158 Iowa 507; 1 Black on Rescission of Contracts, Section 48.

It is not shown that any negotiations were had with plaintiff by the defendant Ralph Milroy with reference to the purchase of his interest in the estate before he went to South Dakota. That his intention was to obtain conveyance from him of his interest in the estate is conclusively evidenced by the fact that he had the necessary papers prepared, before departing for South Dakota, and took them with him. Failing to consummate a purchase for $1,000, which sum, he knew, was grossly inadequate, he promptly followed plaintiff to Hopkinton, ascertained that he had consulted an attorney, and hired Barnes to obtain the dismissal of the attorney and to make a settlement with plaintiff. A commission of $100 was later paid by Milroy to each, Barnes and Johnson. The entire transaction was closed within four or five days after plaintiff became of age. Doubtless, he did not know the value particularly of the Delaware County land; and defendants were enabled, by the methods adopted, easily to procure the execution of the instruments canceled by the decree of the court. Plaintiff was young, eager for an automobile, and without business experience in matters of the magnitude in controversy. Manifestly, he did not know, when consulting with Barnes and Johnson, in whom he seems to have placed confidence, that they were the paid agents of the defendants. The court below, who heard the evidence and saw the parties upon the witness stand, possessed advantages not enjoyed by this court. After taking the matter under advisement, the court ordered the written contract and deeds executed by plaintiff, canceled. Confessing that we have arrived at our conclusion with some difficulty, we are, nevertheless, satisfied that the decree in favor of plaintiff should be sustained. It required plaintiff to put the defendants *in statu quo,* and this he must do.

II. As already stated, the court declined to set aside the conveyances of Mary Milroy's interest in the estate of her husband, executed to the defendants by the said Mary Milroy. Without herein reviewing the evidence, it is our conclusion that the evidence relied upon to establish the mental incompetency of Mary Milroy and the fraud and undue influence is insufficient

to justify the cancellation of the conveyances. The preponderance of the testimony satisfactorily shows that, in making these conveyances, she acted intelligently and voluntarily. It follows that the judgment and decree of the court below is affirmed upon both appeals. Each party will pay one half of the costs in this court.—*Affirmed.*